John Penrose, Appellant *v.* Philadelphia Zoning Board of Adjustment, Appellee, and Children's Aid Society of Pennsylvania, Intervening Appellee.

Argued April 9, 1976, before Judges KRAMER, WILKINSON, JR., and BLATT, sitting as a panel of three.

*A. Martin Herring,* with him, of counsel, *Teitelman, Sagot, Herring, Jennings & Luber,* for appellant.

*Barbara S. Gilbert,* Deputy City Solicitor, with her *Raymond Kitty,* Deputy City Solicitor, and *Sheldon L. Albert,* City Solicitor, for appellee.

*Peter M. Mattoon,* with him *Vincent Hatton,* and, of counsel, *Ballard, Spahr, Andrews & Ingersoll,* for intervening appellee.

OPINION BY JUDGE WILKINSON, May 19, 1976:

This is an appeal from an order of the Court of Common Pleas of Philadelphia County which summarily affirmed a decision by the Philadelphia Zoning Board of Adjustment (Board) granting the Children's Aid Society of Pennsylvania (Society) a certificate and variance to use certain premises as a foster home and accessory administrative offices.[1] Since the court did not take additional evidence, our scope of review is limited to a determination whether the Board abused its discretion or committed an error of law. *Pollock v. Zoning Board of Adjustment,* 20 Pa. Commonwealth Ct. 641, 342 A.2d 815 (1975).

On April 11, 1973, the Society applied to the Philadelphia Department of Licenses and Inspections (L & I) for a zoning permit to utilize a three-story stone dwelling located in an R-2 residential district in Germantown as a group foster home for ten children and four supervising adults, and a rear semi-detached garage with a second floor apartment as accessory administrative offices. The garage is not attached to the stone dwelling but shares a common party wall with an adjacent residence. L & I referred the application to use the dwelling as a foster home to the Board on the basis that such use required a Board certificate, and refused the use of the garage as accessory offices on the ground that such use was not permitted in an R-2 district. The Society appealed to the Board.

---

1. The Society also appears to have been granted permission to construct an eight-car open air off-street parking lot, which grant is not specifically being challenged before us.

FOSTER HOME

Pursuant to Section 14-203 (2) (b) of the Philadelphia Code (Code), the Board granted the Society a certificate allowing the use of the stone dwelling as a group foster home. Section 14-203 (2) (b) provides:

"(2) The following non-residential uses shall be permitted [in an R-2 residential district] only if a Board of Adjustment certificate is obtained and provided that they are conducted in completely enclosed detached buildings:

. . . .

"(b) Charitable institutions."[2]

The Board found that the dwelling was detached, that the foster home was a charitable institution, and that the Society met its burden of proof under Section 14-1803 of the Code necessary to obtain a certificate.[3]

Appellant argues that the Board erred in granting the certificate, asserting that the foster home is primarily a residential use contrary to the introductory language of Section 14-203 (2) referring to "non-residential uses," a phrase not defined in the Code. We cannot agree. A careful reading of the preliminary provisions of Section 14-203 (2) indicates that the word "non-residential" is mere-

2. In addition to charitable institutions, Section 14-203 (2) permits the following: (1) art galleries, museums and/or libraries; (2) club houses, lodges, and fraternity houses; (3) fire stations; (4) occupations customarily and traditionally conducted in a home; (5) medical facilities; (6) police stations; (7) rest, old age, nursing or convalescent homes, and nurseries; (8) water or sewage pumping stations.

3. Section 14-1803 requires an applicant for a certificate to present evidence relating to the effects of his proposed use on: (1) traffic congestion; (2) fire safety; (3) population density; (4) light and air supply to adjacent property; (5) transportation, water, sewer, school, park and other public facilities; (6) public health, safety and welfare; (7) the spirit and purpose of the zoning regulations; and (8) any approved area redevelopment or comprehensive plans.

ly a legislative declaration *describing* the uses which are enumerated in that section—*i.e.,* a determination by the City Council of Philadelphia that such uses are "nonresidential." The word does not establish a requirement which must be met in order to obtain a Board certificate.

Rather, the only requirements are: (1) that the use fall into one of the nine categories set out under Section 14-203 (2) ; (2) that the use be conducted in completely enclosed detached buildings; and (3) that the applicant satisfy his burden of proof under Section 14-1803. As previously stated, the Board found that the foregoing requirements were fulfilled. Since these findings are supported by substantial evidence, we hold that the Board neither abused its discretion nor committed an error of law in issuing a certificate for a group foster home and must be sustained.

In so holding, we summarily reject appellant's contention that the phrase "charitable institutions" in Section 14-203 (2) (b), which phrase is also not defined in the Code, is so vague and broad as to amount to an unconstitutional delegation of authority to the Board. The word "charitable" provides the Board sufficient guidance to decide whether a use is one permitted by certificate under that section.

## ADMINISTRATIVE OFFICES

In addition to allowing a group foster home by certificate, the Board granted the Society a variance to permit the use of the rear garage as administrative offices. The Board effectively found that such use was accessory to the operation of the premises as a foster home and concluded that it likewise had to comply with the "detached buildings" proviso of Section 14-203 (2) (b). However, since the garage is semi-detached, the Board held that a variance was necessary.

Appellant contends that the Board erred, arguing that the variance was granted sua sponte and that it is not

supported by the record. We agree. An examination of the Society's application to L & I for a zoning permit, its presentation of evidence before the Board, and its memorandum of law submitted to the Board following the hearing, reveals that the Society applied to use the garage as offices solely on accessory use grounds. The Board, however, not only decided those grounds but also unilaterally raised and resolved a variance matter. Therefore, the Board erred in deciding an issue not properly before it for disposition. Moreover, a review of the entire record fails to reveal evidence demonstrating the hardship required by the Code to justify a variance.[4] Nevertheless, as an inspection of the pertinent Code sections will show, the Society will not be denied its use of the garage as administrative offices.

Initially, we emphasize that Section 14-203(2)(b), which permits charitable institutions as a principal use in an R-2 district provided they are conducted in detached buildings, only refers to that use. It does not refer to accessory uses. We must look, rather, to Section 14-203(1)(e), which states:

"(1) *Use Regulations.* The specific uses permitted in this [R-2 residential] district shall be the erection, construction, alteration or use of buildings and/or land for:

. . . .

"(e) Accessory uses, as defined."

The Code, under Section 14-102(2), defines accessory use as follows:

---

4. Section 14-1802 requires an applicant for a variance to establish, *inter alia*: (1) that unnecessary hardship, due to the physical condition of the premises, will be caused by compliance with the zoning regulations; (2) that the hardship is unique to the property; (3) that the hardship is not self-inflicted; and (4) that a variance will not substantially or permanently injure adjacent property.

"(2) *Accessory Use*. A use, including all necessary public utility facilities, subordinate to the main use on the lot and customarily incidental to the main use, excluding signs."

The foregoing provisions indicate that accessory uses to a charitable institution are specifically permitted uses governed by Section 14-203(1)(e), which contains no "detached buildings" proviso, not by Section 14-203 (2)(b). Thus, any use, which is subordinate and customarily incidental to a charitable institution, is permitted as an accessory use to that institution without regard to the type of building so utilized. In short, while a building used as a charitable institution must be detached, a building used accessory thereto need not. Consequently, the use of a semi-detached building accessory to a charitable institution does not require a variance.

In the present case, the Board certificate allowing the use of the stone dwelling as a group foster home, which we have held was properly granted, establishes a charitable institution as the main use on the lot. Further, findings of the Board, supported by substantial evidence, effectively demonstrate that the use of the rear semi-detached garage as administrative offices is subordinate and customarily incidental to the operation of such home.[5] We are, therefore, compelled to hold that the Society is entitled to use the garage as it proposes as a specifically permitted use under Section 14-203(1)(e) notwithstanding the Board's gratuitous and otherwise improper granting of a variance.

---

5. In its seventh finding of fact, the Board states that the apartment on the second floor of the garage "will be upgraded and used by the Superintendent or Director for his office in connection with the foster care home." In its third conclusion of law, the Board states that "the use of the rear garage for administrative offices is an integral part of its [the proposed foster home's] operation and functioning."

Accordingly, we reverse the order of the lower court to the extent that it affirms the grant of the variance, and remand to the court to enter an order directing the issuance of an appropriate permit authorizing the proposed utilization of the rear garage as a specifically permitted accessory use to the operation of a group foster home. Otherwise, we affirm.

Judge KRAMER did not participate in the decision in this case.